UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

WARREN N. LOVE,

Defendant.

**DECISION AND ORDER**

6:25-CR-06120 EAW

---

Pending before the Court are objections (Dkt. 46) filed by defendant Warren N. Love ("Love" or "Defendant") to a Report and Recommendation entered by United States Magistrate Judge Mark W. Pedersen on June 4, 2026, recommending that the undersigned deny Love's motion to suppress tangible evidence, and grant in part and deny in part Love's motion to suppress statements[1] (Dkt. 45 (the "R&R")). For the reasons below, the Court sustains Love's objections and grants the motion to suppress. (Dkt. 19).

## BACKGROUND

Love is charged in a one-count indictment alleging that on or about July 15, 2025, he unlawfully possessed a firearm and ammunition as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Dkt. 11).

The R&R addresses a motion to suppress evidence and statements that Love filed on October 14, 2025. (Dkt. 19). In his motion, Love seeks suppression of "all fruits of this unlawful seizure," including "the gun (including the magazine and ammunition),

---

1 This Court referred all pretrial matters in the case to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Dkt. 13).

observations and recordings of the gun . . . and evidence of [his] status as a convicted felon," and suppression of certain statements attributed to him on the ground that they were the product of custodial interrogation. (Dkt. 19-1 at 2, 11). The government opposed the motion to suppress on October 28, 2025 (Dkt. 20), and Love filed a reply on November 4, 2025 (Dkt. 21). The magistrate judge held oral argument on the motions on November 13, 2025, at which time he set deadlines for additional submissions. (Dkt. 22). Love made further submissions in support of the motion to suppress, requesting a suppression hearing. (*See* Dkt. 24; Dkt. 25; Dkt. 26). The magistrate judge held a further appearance on December 2, 2025, at which time he determined that an evidentiary hearing as to the seizure of the vehicle, up until when the door of the vehicle was opened, was warranted. (Dkt. 27).

An evidentiary hearing was held on February 4 and 5, 2026, at which time the government called Deputy United States Marshal Jeremy Marrero ("DUSM Marrero"), New York State Trooper James Buonaugurio, and New York State Trooper Joshua Athoe to testify, and Love called Federal Public Defender Investigator Karen Francati and Rochester Water Bureau Supervising Engineering Technician James Treuthart to testify. (Dkt. 36; Dkt. 37; Dkt. 38 (transcript of February 4 hearing proceedings); Dkt. 39 (transcript of February 5 hearing proceedings)). The government filed post-hearing briefing on April 13, 2026 (Dkt. 42), Love filed a response on April 27, 2026 (Dkt. 43), and the government replied on May 4, 2026 (Dkt. 44).

The magistrate judge issued the R&R on June 4, 2026. (Dkt. 45). In the R&R, the magistrate judge recommends that the Court deny Love's motion to suppress tangible evidence, and grant in part and deny in part Love's motion to suppress statements. (*Id.* at

3). After summarizing the hearing testimony (*id.* at 4-18), the magistrate judge concluded with respect to suppression of tangible evidence, that law enforcement properly stopped the vehicle in which Love was a passenger because there was reasonable suspicion that criminal activity was afoot, and also there was probable cause to stop the vehicle because DUSM Marrero observed Love carrying an unconcealed handgun in violation of N.Y.S. Penal Law § 400.00(2) and (15).[2] (*Id.* at 19-24). The magistrate judge further found that law enforcement properly searched the vehicle, and that the officers had probable cause to arrest and search Love. (*Id.* at 32-34). With respect to Love's statements, the magistrate judge concluded that Love's statements before receiving his *Miranda* warnings were either pedigree statements or spontaneously made, except for the statement "You know me from the feds." (*Id.* at 35-41).

Love filed objections to the R&R on June 18, 2026. (Dkt. 46). Love raises specific objections to the magistrate judge's finding that law enforcement lawfully stopped the vehicle in which Love was a passenger, including because there was no reasonable suspicion or probable causing justifying the stop. (*Id.* at 1-9). In addition, Love objects to the magistrate judge's finding that law enforcement lawfully arrested him, and to the recommendation not to suppress, on Fifth Amendment grounds, certain statements Love made to DUSM Marrero. (*Id.* at 9-12).

---

2 The magistrate judge rejected the government's argument that the officers had reasonable suspicion or probable cause to stop Love's vehicle based on a violation of the New York State Vehicle and Traffic Law ("NYVTL"). (Dkt. 45 at 24-30). The government does not object to this determination, and the Court adopts it. Accordingly, the government may not rely on a NYVTL violation as a basis for stopping the vehicle.

The government filed its response to Love's objections on July 2, 2026. (Dkt. 48). The government represents that it has no objection to the magistrate judge's recommendation that the Court suppress Love's statement, "You know me from the feds." (*Id.* at 2 n.1).

The Court held oral argument on the objections on July 23, 2026, at which time it reserved decision and set a deadline to receive supplemental briefing. (Dkt. 51; Dkt. 52). The government and Love submitted supplemental briefing on August 10, 2026 (Dkt. 53; Dkt. 54), and responses on August 17, 2026 (Dkt. 55; Dkt. 56). The Court heard further argument on Love's objections on September 25, 2026, and reserved decision. (*See* Dkt. 60).

The R&R thoroughly discusses the relevant hearing testimony. (*See* Dkt. 45 at 4-18). The Court assumes the parties' familiarity with that summary and with the hearing testimony. Accordingly, the Court will not provide another recitation of the hearing testimony, but will discuss relevant testimony when necessary in its evaluation of the legal issues.

## **DISCUSSION**

Love raises three specific objections to the R&R. First, he objects to the magistrate judge's conclusion that the officers lawfully stopped the vehicle in which Love was a passenger, including because DUSM Marrero's observations did not provide reasonable suspicion for the stop, and because DUSM Marrero's observations did not provide probable cause for the stop. (Dkt. 46 at 1-9). Love next objects to the magistrate judge's conclusion that the officers lawfully arrested Love after they stopped the car, including because the

officers did not conduct a justified protective search, the officers did not have probable cause to believe that the car contained contraband or evidence of a crime, and the officers did not have probable cause to arrest Love. (*Id.* at 9-11). Finally, Love objects to the magistrate judge's conclusion that Love's statements to DUSM Marrero should not be suppressed, on the basis that the statements were the product of custodial interrogation. (*Id.* at 11-12).

## I. **Standard of Review**

A district court reviews any specific objections to a report and recommendation on a dispositive issue, such as a motion to suppress, under a de novo standard. Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). To trigger the de novo review standard, objections to a report and recommendation "must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. Similarly, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review." *United States v. Peldomo*, No. 10-CR-0069 (RRM)(ALC), 2010 WL 5071489, at *1 (E.D.N.Y. Dec. 7, 2010) (citations, quotation, and alteration omitted).

## II. <u>The Stop</u>

The Court turns first to Love's objections to the magistrate judge's conclusion that he was lawfully stopped by law enforcement, both because they had probable cause and reasonable suspicion to do so.

### A. Hearing Testimony and Evidence

DUSM Marrero testified that on July 15, 2025, he was working an unrelated fugitive case in the parking lot of the Family Dollar on Dewey Avenue in Monroe County. (Dkt. 38 at 9). DUSM Marrero was by himself in the driver's seat of an undercover vehicle. (*Id.* at 9, 13). DUSM Marrero observed a gray Cadillac sedan with "heavily dark tinted windows"—which was not unusual for that area of the city—enter the Family Dollar lot and park next to him on the driver's side of his vehicle. (*Id.* at 10-11, 13). Two individuals exited the vehicle, and the individual who had been sitting in the passenger seat gave DUSM Marrero what he characterized as a "hard stare," or "very stern eye-to-eye contact." (*Id.* at 10, 12).

DUSM Marrero testified that the individual in the passenger seat of the vehicle "came in [his] memory as [he] had a past interaction with him." (*Id.* at 11). He elaborated that he "had some type of police contact or interaction with [him] in the past," but DUSM Marrero could not remember the individual's name or circumstances of their interaction. (*Id.* at 12; *see also id.* at 34-35 (stating that, based on his experience as a DUSM, it "just came to mind that we've previously arrested or had interaction with him so in my mind the individual had convicted a felony," but also that he did not know who the passenger was at that point, only that the passenger looked familiar)). DUSM Marrero also testified that

he encounters various individuals in the course of his work as a DUSM, including witnesses, suspects, informants, staff, other law enforcement officers, investigators, attorneys, and judges. (*Id.* at 48-49).

The two individuals from the Cadillac sedan entered the Family Dollar and remained there for approximately five to seven minutes. (*Id.* at 10, 13). The two individuals then exited the Family Dollar and looked at DUSM Marrero's vehicle, and the passenger again gave Deputy Marrero a hard stare. (*Id.*). DUSM Marrero noticed that when the individuals returned to the sedan, the passenger threw trash out of the car. (*Id.* at 14, 38).

Because DUSM Marrero was in a Dodge Durango, he was seated approximately three to four feet off the ground, and from his vantage point, he could look down at the passenger in the sedan. (*Id.* at 39). DUSM Marrero observed the passenger inside the sedan "lean[ ] forward enough," so that DUSM Marrero could observe the grip of a handgun, which was "a pinkish color," in the right pocket of the individual's shorts. (*Id.* 14-15). DUSM Marrero estimated that the grip was visible for about 30 seconds. (*Id.* at 15). DUSM Marrero testified that an individual carrying a firearm must do so in a "completely concealed" manner, and therefore by seeing the grip, it drew his attention. (*Id.* at 16).

DUSM Marrero observed the sedan leave the Family Dollar parking lot and make a left-hand turn to head southbound on Dewey. (*Id.* at 16). DUSM Marrero went over the TAC channel—which is the radio channel by which he can communicate with other law enforcement officers—to see if there were additional law enforcement resources to pursue

and stop the sedan. (*Id.* at 16, 19). After allowing the sedan to leave, DUSM Marrero left the parking lot in the same direction as the sedan. (*Id.* at 17). DUSM Marrero testified that over the TAC channel, he described the vehicle as an older grayish color Cadillac, that the first three letters of the license plate were "LDX," that the vehicle was occupied by two individuals, and the passenger had a firearm in his right pocket. (*Id.* at 19).

The Court has listened to the audio recording of DUSM Marrero's radio communication over the TAC channel, in which DUSM Marrero reported that he was sitting in a parking lot on Dewey and observed two males in a silver grand Cadillac with the license plate LDX. The passenger had a firearm in his right pocket and was traveling south on Dewey passing Emerson. DUSM Marrero explained that the passenger looked familiar, but he "can't think of where he's from." DUSM Marrero described the passenger as a heavier-set black male with tattoos on his neck, approximately 5'6 to 5'7 in height, and 240 to 250 pounds. At one point during the TAC channel recording, DUSM Marrero asks about an individual named "Gregory King," and he testified that he was trying to refresh his recollection as to how he knew the passenger. (*See id.* at 27).

**B. Reasonable Suspicion to Stop Defendant**

Love first objects to the magistrate judge's conclusion that law enforcement lawfully stopped the vehicle in which Love was a passenger because DUSM Marrero's observations did not provide reasonable suspicion for the stop. (Dkt. 46 at 2). Love argues that DUSM Marrero's testimony that Love gave him a "hard stare" before and after leaving the Family Dollar, that DUSM Marrero's belief that he knew Love and "in my mind the individual" had a prior felony conviction, and that the firearm was partially visible in

Love's pocket inside the sedan, does not amount to reasonable suspicion. (*Id.*). In response, the government argues that DUSM Marrero's report of Love possessing a firearm provided reasonable suspicion to stop the sedan, and that a police officer may briefly detain a person to ask questions if the officer has reasonable suspicion that "criminal activity is afoot." (Dkt. 48 at 5-6).

The magistrate judge concluded that law enforcement had reasonable suspicion to stop the sedan, "based on Deputy Marrero's observations and the totality of the circumstances known to the officers who pulled over the vehicle that matched the description of that provided by Deputy Marrero." (Dkt. 45 at 20). The magistrate judge specifically noted DUSM Marrero's testimony that Love gave him a "hard stare" before entering and after exiting the Family Dollar, that DUSM Marrero observed what he believed to be the grip of a firearm in Love's pocket[3], and also that DUSM Marrero believed he had seen Love before and that he had been convicted of a felony. (*Id.* at 20-21). The magistrate judge relied on the Second Circuit's decision in *United States v. Hagood*, 78 F.4th 570 (2d Cir. 2023), where the court stated, "[i]t is well established that a bulge consistent with the shape of a firearm, and located somewhere a firearm would likely be found, supports reasonable suspicion." *Id.* at 577. (Dkt. 45 at 22). The magistrate

[3] The magistrate judge also stated that DUSM Marrero's attention was drawn to the gun because Love "carried the handgun in such a casual manner in his pocket" (Dkt. 45 at 20), but DUSM Marrero did not provide any such testimony at the hearing. While DUSM Marrero testified that his attention was drawn to Love because he saw the grip of the handgun, DUSM Marrero did not testify to any opinion regarding Love "casually" carrying the handgun, nor did he testify that such means of carry would suggest that criminal activity was afoot or is otherwise improper.

judge noted that the circumstances here were even more obvious because DUSM Marrero actually observed the grip of a handgun in Love's pocket, and "[i]t follows that there existed reasonable suspicion that Defendant was engaged in criminal activity, more specifically, unlawful possession of a firearm." (*Id.*).

In a footnote, the magistrate judge acknowledged Love's argument that *Hagood* involved the seizure of a firearm that occurred in 2020, before the United States Supreme Court's decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), and New York's amendment to its gun licensing law. (Dkt. 45 at 22 n.4). The magistrate judge cited a decision from the Eastern District of New York addressing this issue, *United States v. Homer,* No. 23-CR-86 (NGG), 2024 WL 1533919 (E.D.N.Y. Apr. 9, 2024). *Homer* involved a motion for reconsideration, wherein the district judge noted that "[i]n its M&O, the court cited to *Hagood* to stand for the proposition that '[e]ven after *Bruen*, police officers have reasonable suspicion to justify a *Terry* stop when seeing someone they suspect has a gun,'" and while the court did not change its assessment, it concluded that "*Hagood*, based on a pre-*Bruen* arrest, cannot stand as controlling authority for that proposition." *Id.* at *4 n.7. The magistrate judge noted that the *Homer* case was "merely persuasive and cannot overrule a Second Cicuit case." (Dkt. 45 at 22 n.4).

Of course, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("Reasonable suspicion demands specific and

articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing.”).

Reasonable suspicion is “considerably less than proof of wrongdoing by a preponderance of the evidence” and “obviously less demanding than that for probable cause.” *Sokolow*, 490 U.S. at 7. “The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances.” *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017). Reasonable suspicion cannot be based on “inchoate suspicion or mere hunch.” *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). While a court should evaluate the totality of the circumstances “through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,” a court should not “merely defer to the police officer’s judgment.” *Id.* (quoting *Bayless*, 201 F.3d at 133); *see also Walker*, 965 F.3d at 186 (while viewing the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, courts should not merely defer to police officers’ judgments). “Contextual considerations, such as the fact that the stop occurred in a high crime area, factor into a reasonable-suspicion analysis, and the officers’ assessment of an individual’s nervous or evasive behavior is pertinent in establishing reasonable suspicion.” *Massimino v. Benoit*, 188 F.4th 120, 135-36 (2d Cir. 2026) (citation omitted).

The impact of *Bruen* on Second Circuit caselaw regarding reasonable suspicion is a key issue here. To that end, on June 23, 2022, the Supreme Court decided *New York State*

*Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022), wherein it held that the Second and Fourteenth Amendments protect an individual's right to carry a handgun in public for self-defense. In doing so, the Supreme Court concluded that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

"[T]he Court is mindful that post-*Bruen*, jurisprudence on the intersection of the Second and Fourth Amendment protections is in its infancy." *United States v. Fallin*, No. ELH-25-00179, 2026 WL 1693595, at *28 (D. Md. June 11, 2026) (quotations and citation omitted); *see also United States v. Libertad*, 681 F. Supp. 3d 102, 116 (S.D.N.Y. 2023) ("In a post-*Bruen* world, where it is abundantly clear that citizens have the right not just to keep but also to bear arms, including outside the home, it becomes hard to say that the suspicion or even knowledge that someone is carrying a gun constitutes suspicion or knowledge of criminal activity."), *aff'd on other grounds*, 152 F.4th 89 (2d Cir. 2025). But if *Bruen* holds that law-abiding citizens can carry firearms without demonstrating "proper cause" to do so, then in shall-issue states[4] like New York, it logically follows that an individual's mere possession of a firearm, standing alone, cannot indicate that "criminal activity may be afoot." Both out-of-circuit and in-circuit cases support this interpretation of *Bruen*. *See, e.g., United States v. Wilson*, 143 F.4th 647, 656-59 (5th Cir. 2025)

[4] A shall-issue state is "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 592 U.S. at 13.

(rejecting district court's conclusion that law enforcement is justified in *Terry* stopping anyone carrying a firearm, explaining that there is no "firearm exception" to a *Terry* stop, which is instead premised on reasonable, individualized suspicion, and also citing *Bruen* for the proposition that keeping and bearing firearms is presumptively lawful nationwide, and therefore the district court's "categorical rule that presumes Louisiana gun owners are committing crimes" was incorrect); *United States v. Daniels*, 101 F.4th 770, 775, 778 (10th Cir. 2024) (explaining that "[i]f we are to take seriously the normative thrust of the Supreme Court's recent decision in [*Bruen*], then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way," and holding that anonymous tip that three black men wearing dark hoodies and jeans were intermittently taking guns in and out of their pockets, getting in and out of a dark SUV, and looked like they were "getting ready to do something," was "too generic" to support reasonable suspicion); *Hicks v. Maryland*, 358 A.3d 74, 93-96 (M.D. App. 2026) (discussing post-*Bruen* cases from the Fifth Circuit, the Appellate Court of Illinois, and the Tenth Circuit, which stand for the proposition that in "shall-issue" jurisdictions, law enforcement cannot rely on a presumption that carrying a firearm is unlawful to justify a *Terry* stop, and concluding that "post-*Bruen*, reasonable suspicion to believe that a person is carrying a gun, by itself, no longer justifies a *Terry* stop"); *see also Homer*, 2024 WL 1533919, at *4 & n.7 (noting that "*Bruen*, which forced New York to dramatically change its firearm licensing regulatory regime and become a 'shall issue' state, had the potential to fundamentally alter how state governments enforce their gun laws," and explaining that *Hagood*'s holding that police officers have reasonable suspicion to justify a *Terry* stop

when seeing someone they suspect has a gun was based on a pre-*Bruen* arrest and "cannot stand as controlling authority for that proposition"); *United States v. Gaskin*, No. 3:22-cr-00098, 2023 WL 3998329, at *7 (D. Conn. 2023) (citing *Bruen* for the proposition that "an individual cannot be presumed to be carrying a firearm unlawfully simply because of their possession of a firearm"); *but see Libertad*, 681 F. Supp. 3d at 116-17 (anonymous 911 tip reporting that the defendant was carrying a bag with a firearm and officer's observation of defendant carrying a weighted bag created reasonable suspicion, concluding that "[a]s to a search occurring one year before *Bruen*, this Court . . . has little trouble concluding that to the extent the police had reasonable suspicion [the defendant] was carrying a concealed gun in New York City, that sufficed at that time to create reasonable suspicion of unlawful activity," but adding that "the Court doubts that, even following *Bruen*, the police cannot follow up on a sufficiently corroborated tip that someone is carrying a gun by at least taking steps to verify that that person is lawfully entitled to carry a gun, such as, for instance, by verifying her permit"); *People v. Mitchell*, No. 70461-2023, 2024 WL 1751768, at *4 (N.Y. Sup. Ct. Apr. 16, 2024) (explaining that although *Bruen* struck down one aspect of New York's licensing scheme, "a person who possesses a firearm without any claim of lawful, licensed possession and waves it in the air in plain view of a law enforcement officer has no right to avoid arrest").

In its response to Love's objections, the government argues that the *Bruen* issue is a "nonstarter." (Dkt. 48 at 9).[5] In support of this statement, the government cites the

---

[5] The government suggests that law enforcement is entitled to stop anyone they believe may be carrying a firearm and confirm that they are carrying it lawfully, and that

*Hagood* case (again, a pre-*Bruen* decision, and therefore not controlling authority on the issue), and an unpublished district court decision, *United States v. Torres*, No. 23-cr-395 (JGK), 2024 WL 1251186 (S.D.N.Y. Mar. 22, 2024). In *Torres*, the district court stated that "there is nothing in *Bruen* that alters the well-established law in this Circuit that the possession of a firearm provides probable cause to arrest" (and citing to *Hagood* in support of this proposition), and the court further noted that while "*Bruen* has changed the circumstances under which a person can obtain a license to carry a firearm . . . that does not mean that a person who possesses a firearm without any claim of lawful, licensed possession, and conceals the firearm and acts in a suspicious manner, has not provided probable cause to arrest." *Id.* at *9.

The Court does not find the government's citation to the *Torres* case to be persuasive. First, to the extent *Torres* stands for the proposition that possession of a

---

*Bruen* does not prevent law enforcement from taking such actions. (*See* Dkt. 48 at 10 n.3 (stating that a person arrested or stopped for illegal possession of a firearm who possesses a permit has the recourse of producing the valid permit and would be free to leave once it was produced, or to advance the permit as a defense at trial)). Even if the Court agreed that this was the case—which it does not, *see, e.g.*, *Hicks*, 358 A.3d at 94 ("a 'per se presumption of illegality would have untenable consequences in other areas'" (citation omitted)); *Gaskin*, 2023 WL 3998329, at *7 ("an individual cannot be presumed to be carrying a firearm unlawfully simply because of their possession of a firearm")—that is not what occurred here. DUSM Marrero did not testify that he intended to stop Love to confirm that he carried a valid permit for the firearm. Nor did DUSM Marrero stop Love when he observed the firearm to question him regarding its legality. Instead, DUSM Marrero allowed Love and the vehicle to leave the parking lot, radioed to other law enforcement over the TAC channel and gave a description of the vehicle in which Love was a passenger, and Love's vehicle was ultimately surrounded by law enforcement and he was apprehended. In other words, even if law enforcement was permitted to presume that individuals are carrying firearms illegally and to stop them to confirm they possess a valid license, circumstances here are far from a simple inquiry about whether Love was licensed to carry the firearm.

firearm, standing alone, provides probable cause to arrest, the Court disagrees. The import of *Bruen* is that a law-abiding citizen does not have to show "proper cause" to lawfully carry a firearm outside the home, and it is thus permissible for those individuals to carry a firearm in public. Second, in *Torres*, the court's conclusion that there was reasonable suspicion to stop and frisk the defendant was not based solely on the L-shaped bulge in the defendant's front sweatshirt pocket. Law enforcement observed Defendant in a high-crime neighborhood, traveling with another individual who was wearing a ski mask and acting evasively. *Id.* at *8. Officers also observed that the defendant was acting suspiciously in attempting to conceal and clutch the L-shaped bulge. *Id.* at *9. In other words, there were additional circumstances in *Torres* beyond the mere possession of the firearm indicating that criminal activity was afoot.

Despite the far-reaching implications of *Bruen*, law enforcement may of course execute a *Terry* stop based on reasonable suspicion, and the facts establishing reasonable suspicion may include the individual's possession of a firearm. But reasonable suspicion cannot be based solely on the fact that the individual is carrying a firearm. *See, e.g.*, *Homer*, 2024 WL 1533919, at *4 n.7; *Hicks*, 358 A.3d at 96. After *Bruen*, more than just possession of a firearm is needed. There must be other situational factors indicating that criminal activity is afoot, such as that the officer knows the individual cannot lawfully carry a firearm, the individual is engaged in a crime using the firearm, the individual is carrying the firearm in a high-crime area, and/or the individual is engaging in nervous or evasive behavior. *See, e.g.*, *United States v. Dudley*, No. 25-4055, 2025 WL 3012823, at *2 (4th Cir. Oct. 28, 2025) (affirming district court's conclusion that officers had reasonable

suspicion that defendant was unlawfully possessing a firearm, including because the officers saw a bulge consistent with the shape of a firearm, the officers knew the defendant was a convicted felon, and the defendant fled upon being asked about the contents of his pocket); *Fallin*, 2026 WL 1693595, at *30 (concluding that reasonable suspicion existed where officer observed by way of a CitiWatch camera the defendant withdraw a handgun from his waistband, the defendant was in an area of Baltimore regarded as a high-crime area, including that a murder had occurred about 10 days earlier about one block away, and the officers understood that Maryland law prohibited the open wear or carry of a handgun); *United States v. Burgos*, No. 5:25-CR-214 (AJB), 2026 WL 91966, at *2, 4 (N.D.N.Y. Jan. 13, 2026) (holding that there was reasonable suspicion to stop the defendant, since the officer was aware of the defendant's relevant criminal history—including that he had pleaded guilty to an armed robbery, and was a "person of interest" in another robbery—and he was acting in a highly nervous manner, including that he immediately began motioning toward his waistband and front jacket pocket, and the officer believed the defendant was reaching for an object he could not see). Indeed, even in the *Hagood* case, which was based on the defendant's possession of a firearm pre-*Bruen*, the reasonable suspicion was not based solely on a bulge consistent with the shape of a firearm; in addition, the defendant appeared nervous and agitated, and the defendant was outside, late at night, in a high-crime neighborhood—and these factors together supported reasonable suspicion for the stop. *Hagood*, 78 F.4th at 578, 580 ("The district court thus correctly concluded that Hagood's unusual way of wearing the fanny pack, his nervous demeanor, and the time and location of the encounter 'reinforced' its finding of reasonable suspicion,

even though such observations 'would fall well short of establishing reasonable suspicion' if made 'in isolation'").

With that legal framework in mind, the Court turns to the specific facts of this case and whether law enforcement had reasonable suspicion to stop Love. As explained above, the standard for reasonable suspicion is "not high," but it also requires "specific and articulable facts," viewed "through the eyes of a reasonable and cautious officer on scene." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021). The Court has examined the totality of the circumstances, including DUSM Marrero's testimony at the evidentiary hearing as well as the recording of his TAC channel call. Unlike many of the cases discussed above, there is no testimony in the record that DUSM Marrero observed Love with a firearm in a high-crime or drug-prone area, that Love was loitering late at night, that Love was a known gang member, that Love was in the process of planning or committing a crime, or that Love was under investigation for committing a violent crime. Nor was there any testimony that Love was acting in a nervous or evasive manner (in fact, the testimony at the hearing was that Love twice made direct eye contact with DUSM Marrero, which is not indicative of evasive behavior). In other words, DUSM Marrero was suspicious, but there is no evidence that Love was acting suspiciously. Rather, DUSM Marrero was suspicious because he thought he recognized Love (who twice gave him a "hard stare") and he observed Love possessing a firearm while seated in the vehicle.

As explained above, the presence of the firearm standing alone cannot support a finding of reasonable suspicion, and therefore the only additional facts proffered to support reasonable suspicion in this case are (1) Love looked familiar to Deputy Marrero, and (2)

Love looked at DUSM Marrero. While the standard for reasonable suspicion is not high, these two facts fall short of indicating that criminal activity is afoot.

Although DUSM Marrero testified that Love looked familiar, he could not recall Love's identity, nor could he recall from where specifically he recognized Love. The evidence at the hearing and on the TAC recording demonstrated that at one point during the events in question, DUSM Marrero seemed to wonder aloud whether Love was an individual named Gregory King, which was not accurate, and it was not until after the stop of the vehicle that DUSM Marrero learned Love's identity. *See, e.g.*, *Gaskin*, 2023 WL 3998329, at *7 (officers did not have probable cause to arrest the defendant for unlawful possession of a firearm and conduct search incident to arrest, where the defendant's driver's license "was run *after* the second search commenced," and "[t]hus, his status as a convicted felon was uncertain," and "by the time of the second search, the officers did not have enough facts to support probable cause").

While DUSM Marrero testified that "in his mind" he believed Love had previously committed a felony, he offered no specific and articulable facts supporting that belief, which is necessary for a finding of reasonable suspicion. Rather, as shown by the TAC recording, DUSM Marrero expressly stated that while Love looked familiar, he could not "think of where he's from" and DUSM Marrero acknowledged at the hearing that he has many interactions with various individuals in the course of his employment, including witnesses, suspects, informants, staff, other law enforcement officers, investigators, attorneys, and judges—not all of whom are felons. In other words, it was neither reasonable nor cautious for DUSM Marrero to believe that simply because he recognized

Love—or even because he recognized Love from his work as a DUSM—that Love must have been convicted of a felony and it was therefore unlawful for him to possess a firearm. *See United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("Being a felon in possession of a firearm is not the default status."). DUSM Marrero's belief about Love and his prior criminal status was not based on specific and articulable facts. Instead, it was a hunch—a hunch that ended up being correct, but still just a hunch. Given the current state of the law concerning firearm possession after *Bruen*, a law enforcement officer cannot be said to have reasonable suspicion that criminal activity is afoot just because he observes an individual with a firearm and believes he recognizes the individual. Adding in the "hard stare" (or even the disposal of trash)[6] does not change that conclusion. More is required to justify reasonable suspicion.

In sum, Love's stop was not supported by sufficient specific and articulable facts from which a reasonable and cautious officer on the scene could justify an intrusion into Love's liberty interest. The specific and articulable facts that DUSM Marrero possessed at the time he observed and stopped Love—which were that Love looked familiar, Love made eye contact with DUSM Marrero, and Love possessed what appeared to be a firearm in his pocket—do not indicate that criminal activity may be afoot. Accordingly, Love's objection to the magistrate judge's finding that there was reasonable suspicion for the stop

---

[6] The government argues that the disposal of trash contributes to the finding of reasonable suspicion (*see*, *e.g.*, Dkt. 54 at 13 n.2), although it fails to articulate how that fact meaningfully changes the analysis. Nonetheless, the Court has considered it as part of the totality of circumstances. (*See* Dkt. 38 at 10 (DUSM Marrero testifying that Love's disposal of trash when he returned to the vehicle drew his attention)).

is sustained, and the Court declines to adopt the magistrate judge's recommendation as to this issue.

### C. Probable Cause to Arrest Defendant

Love next objects to the magistrate judge's conclusion that law enforcement lawfully stopped the vehicle in which Love was a passenger because DUSM Marrero's observation of the grip of a firearm provided probable cause for them to stop him. (Dkt. 46 at 7). Love contends that he was not openly carrying the firearm—rather, DUSM Marrero simply observed only a part of the firearm because Love leaned forward in his vehicle, and he observed the firearm while Love was seated in the sedan—and nothing in DUSM Marrero's testimony suggested that Love intended for the firearm to be seen, or that he carried it in a way that was visible to the ordinary observer. (*Id.* at 7-8).

In response, the government contends that DUSM Marrero's observation of the firearm alone provided probable cause to arrest Love because he carried the firearm in violation of N.Y. Penal Law § 400.00(2), citing to New York state cases where a stop or arrest was justified because law enforcement observed an "L-shaped" bulge in the defendant's pants or midsection. (Dkt. 48 at 9-10 (citing *People v. Wall*, 237 A.D.3d 648 (N.Y. App. Div. 2025) and *People v. Contreras*, 2025 WL 3182916 (N.Y. Sup. Ct. Oct. 30, 2025); *see also* Dkt. 54 at 4)). The government concedes that New York law does not set forth a definition for the term "concealed," but argues that "several provisions setting forth conduct in violation of Article 265 of the New York Penal Law are strict liability offenses," which do not require mental culpability when committing the offense. (Dkt. 54 at 3).

In concluding that law enforcement had probable cause to stop the vehicle in which Love was a passenger, the magistrate judge cited N.Y. Penal Law § 400.00(2), which mandates that firearms possessed pursuant to a pistol permit be "carried concealed." (Dkt. 45 at 24). The magistrate judge concluded:

> Because Deputy Marrero, based on his training and experience, saw what he believed was the grip of a gun it was reasonable for him to infer that Defendant was carrying an unconcealed gun in violation of § 400.15 and thus committing a crime.

(*Id.*). In support of this conclusion, the magistrate judge also cites to *Wall*, 237 A.D.3d 648, noting that the circumstances in this case are "even more egregious," since "Deputy Marrero actually saw the handgrip of a gun," as opposed to just the outline of a firearm in form-fitting sweatpants. (*See* Dkt. 45 at 24 n.5). The Court disagrees.

New York law provides for the issuance of pistol licenses to "have and carry concealed." N.Y. Penal Law § 400.00(2)(f). A violation of any provision of this licensing law is a class A misdemeanor. *See id.* at § 400.00(15). As noted above, New York law does not define the meaning of "concealed," nor does the law further extrapolate on what means of carry would be unlawful. The only evidence offered by the government at the evidentiary hearing regarding how an individual should carry a firearm is DUSM Marrero's testimony that an individual carrying a firearm should do so in a "completely concealed" manner. (Dkt. 38 at 16). Despite being given the opportunity to do so, the government has failed to provide any meaningful argument or case law supporting this interpretation of New York's concealed carry law.

As noted above, in support of its position that Love was carrying the firearm in violation of New York's concealed carry law, the government cites *Wall*, wherein the court found that the defendant's carrying a firearm, which appeared as a heavy, L-shaped object in the shape of a firearm in the right pocket of his form-fitting sweatpants, violated N.Y. Penal Law § 400.00(15) for openly carrying a firearm. 237 A.D.3d at 649. In *Wall*, the defendant was carrying the firearm "while standing at a drug-prone corner" *id.*—in other words, on a public street, where anyone walking or driving by could observe the outline of the gun in his sweatpants. And apparently, the firearm was so visible through the defendant's sweatpants that law enforcement could observe it on surveillance video. *Id.* at 648-49.

The Court does not find the *Wall* case persuasive. Here, Love was not standing or walking in public with the firearm when DUSM Marrero observed it. Rather, Love was sitting in a vehicle, and DUSM Marrero testified that he could observe the grip of the firearm because from his vantage point he could look down into the inside of the sedan in which Love was a passenger—and even then, DUSM Marrero testified that he was able to observe a portion of the firearm because Love had leaned forward. (Dkt. 38 at 14). Notably, DUSM Marrero had multiple opportunities to observe Love upon his entering and exiting the sedan, and DUSM Marrero never testified that he observed the firearm, or any indication that Defendant was carrying a firearm, while observing Love entering and exiting the Family Dollar or walking across the Family Dollar lot. DUSM Marrero testified that the vehicle in which Love was a passenger parked next to his vehicle (*id.* at 10), and DUSM Marrero further testified that, at one point, Love was less than 10 feet away (*id.* at

15), but still DUSM Marrero did not see the firearm until Love was seated in the vehicle and bent over.

In his supplemental briefing, Love argues that, at most, New York criminalizes the "open carry" of a gun, and a gun is not "openly carried" simply because it is partially and temporarily visible. (Dkt. 53 at 4-6). Love contends that the key question is whether the gun is apparent "by ordinary observation" to a "casual observer." (*Id.* at 6). Love cites to various secondary sources supporting that "open carry" is the practice of carrying a loaded firearm on one's person in plain sight while in a public place, and the test as to concealment is whether the weapon is carried as to be discernible by ordinary observation. (*Id.* (citing *See* Kermit V. Lipez, *The Evolution of the Supreme Court's Second Amendment Jurisprudence*, 78 Me. L. Rev. 131, 170 n.305 (2026) and 79 Am. Jur. 2d Weapons & Firearms § 18)). Love also cites various state court cases standing for the proposition that when carrying a concealed firearm, the issue is whether the firearm is concealed from the "ordinary observation" of others, *see, e.g.*, *State v. Yarn*, 63 So.3d 82, 85 (Fla. Dist. Ct. App. 2011), and observing only a portion of a handgun would not amount to open carry (Dkt. 53 at 7-8). Although the Court has not identified any New York state cases specifically adopting the ordinary observer test, in *Wall* the appellate division focused on whether the weapon was immediately apparent, which is consistent with the ordinary observer test. *See, e.g.*, *Wall*, 237 A.D.3d at 649 (concluding that the defendant violated Penal Law § 400.00(15) "for openly carrying a firearm," where officers observed on both surveillance camera footage and in-person that defendant was carrying a gun while standing on street corner, based on imprint in the shape of a firearm in form-fitting

sweatpants). Further supporting this approach is that New York bans open carry of firearms "to regulate 'a particular mode of bearing arms' that the legislature deems 'dangerous to the peace of society,'" including "'*largely to prevent disruption of the peace and fear* ***among citizens****, particularly in crowded, modern urban settings*.'" *Frey v. City of N.Y.*, 157 F.4th 118, 139-40 (2d Cir. 2025) (citations omitted) (emphasis added).

Having carefully considered the arguments of the parties and the testimony offered at the evidentiary hearing, the Court concludes that the government has failed to present evidence or argument that DUSM Marrero's viewing of the grip of the firearm under the circumstances here reflects a violation of New York law by Love such that DUSM Marrero had probable cause to stop and arrest Love. The Court finds persuasive Love's arguments concerning the ordinary observer test, and the government has failed to offer any meaningful argument as to why the Court should not accept it. Rather, the government argues that "[d]etermining a firearm is concealed when not observable to the casual observer through ordinary observations would upset the multitude of cases which have determined law enforcement possessed reasonable suspicion and probable cause based upon viewing a firearm." (Dkt. 56 at 6). This argument misses the mark for two reasons. First, as explained above, reasonable suspicion or probable cause may still be present when law enforcement views a firearm, but there must be some other circumstances indicating that criminal activity is occurring, aside from just the presence of a firearm. Second, the ordinary observer test relates not to reasonable suspicion for justifying a *Terry* stop, but rather to whether an individual's possession of a firearm was in violation of the law.

In sum, the Court concludes that DUSM Marrero's temporary, partial viewing of the firearm on Love while Love was seated in the vehicle bending forward—and viewed only due to a distinct vantage point because of the height of the vehicles—is not the kind of behavior that New York's concealed carry law was designed to prohibit. Here, Love was not "openly" carrying a firearm, nor was he in a public place. Rather, DUSM Marrero observed only the grip of the firearm on Love's person, while Love was seated in the vehicle and bending forward. To be clear, the Court would reach a different conclusion if DUSM Marrero knew or otherwise had confirmed Love's identity, and further that he knew Love was a felon and it was unlawful for him to possess a firearm. Under those circumstances, there would be probable cause based on Love's felony status. But DUSM Marrero unequivocally testified that he did not know this information at the time he observed the grip of the firearm in Love's pocket. Similarly, there is no evidence that DUSM Marrero observed Love's possession of the firearm while outside the vehicle, walking to and from the Dollar Store. Accordingly, DUSM Marrero did not have probable cause to believe that Love was in violation of New York law, and the Court sustains Love's objection on this basis and declines to adopt the magistrate judge's finding that DUSM Marrero had probable cause to believe that Love was in violation of Penal Law § 400.00, or that he had committed some other crime.

## III. Love's Remaining Objections

As explained above, Love also raises specific objections to the magistrate judge's conclusion that the officers lawfully arrested Love after they stopped the car, including that because the officers did not conduct a justified protective search, the officers did not have probable cause to believe that the car contained contraband or evidence of a crime, and the officers did not have probable cause to arrest Love. (Dkt. 46 at 9-11). In addition, Love objects to the magistrate judge's conclusion that Love's statements to DUSM Marrero should not be suppressed on the basis that the statements were the product of custodial interrogation. (*Id.* at 11-12).

Given that the Court has concluded that the stop of Love was unconstitutional because law enforcement lacked both reasonable suspicion and probable cause to do so, any events after the stop of Love, including any arrest, search, or statements Love made to police officers, must be suppressed as fruit of the poisonous tree. *See, e.g.*, *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (evidence seized based on illegal stop is subject to fruit of the poisonous tree doctrine and may be suppressed); *United States v. Martinez-Rodriguez*, 798 F. Supp. 3d 289, 303-04 (N.D.N.Y. 2025) (defendant's statements after his arrest, made during unlawful seizure of defendant that was not supported by reasonable suspicion, was suppressible as fruit of the Fourth Amendment violations, including because the government failed to explain how they obtained this evidence independent of the unlawful seizure). The government neglects to address the fruit of the poisonous tree issue, including how law enforcement officers obtained any evidence independent of the unlawful seizure, nor does the Court see any basis for concluding that the fruit of the poisonous tree

doctrine would not apply. As a result, any evidence regarding the arrest of Love, the search of the vehicle, or statements Love made to officers, is suppressed as fruit of the poisonous tree, and the remainder of Love's motion to suppress is granted.

## **CONCLUSION**

For the foregoing reasons, the Court sustains Love's objections (Dkt. 46) to the R&R (Dkt. 45). Love's motion to suppress evidence (Dkt. 19) is granted.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: November 10, 2026
Rochester, New York